**Paul C. GREEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–81–0301–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 15, 1983.

Rehearing Denied Oct. 13, 1983.

Stanley Schneider, Houston, for appellant.

James Brough, Houston, for appellee.

Before JACK SMITH, DUGGAN and LEVY, JJ.

## OPINION

DUGGAN, Justice.

After convicting appellant for the offense of murder, a jury then assessed his punishment at life.

By a supplemental brief, appellant asserts a claim of fundamental error, the resolution of which determines whether or not his original complaints need be considered. We therefore first consider appellant's final, or seventh, ground of error.

Appellant urges in this ground of error that the court's charge to the jury, in applying the law of murder to the facts of the case at the guilt-innocence phase of trial, authorized the jury to convict him "without necessity of the State's proving the absence of sudden passion arising from an adequate cause beyond a reasonable doubt to establish murder." This claim is predicated on the Texas Court of Criminal Appeal decisions in *Cobarrubio v. State,* —— S.W.2d —— No. 63,801 (Tex.Cr.App., January 12, 1983) (en banc), and *Jenkins v. State,* —— S.W.2d —— Nos. 64,000–64,004 (Tex.Cr. App., February 16, 1983). State's motions for rehearing are pending in both cases.

In *Braudrick v. State,* 572 S.W.2d 709 (Tex.Cr.App.1978), the Court of Criminal Appeals stated that, under Section 19.-02(a)(1) of the Texas Penal Code, an additional element of the offense of murder is implied where the evidence raises the issue that the accused was acting under the immediate influence of sudden passion arising from an adequate cause. That issue, if raised, must be disproved by the State in order to establish murder, and a reasonable doubt on the issue requires acquittal of murder and allows conviction only for voluntary manslaughter. *Id.* at 711.

In *Cobarrubio, supra,* the Court held that the burden of proving lack of sudden passion must be placed upon the prosecution, and must be set out in the paragraph of the charge applying the law of murder to the facts of the case. The Court stated that if an instruction on the defensive issue of sudden passion is deleted from the paragraph on murder, and placed only in the voluntary manslaughter paragraph,

> there exists a decided likelihood that a jury would affirmatively answer the murder paragraph, never having considered the defense issue of sudden passion which would reduce the offense of murder to the lesser offense of voluntary manslaughter. . . .

Such a lessening of the State's burden of proof and denial of a defendant's right to have the jury determine his guilt of murder, as interpreted in *Braudrick, supra,* constitutes fundamental error.

As in *Cobarrubio,* the voluntary manslaughter charge in the 1975 trial before us is not included in the paragraph on murder.

The State responds that so long as motions for rehearing are pending in both

*Cobarrubio* and *Jenkins,* application of principles derived from both cases is premature. Additionally, the State insists that, even if *Cobarrubio* and *Jenkins* stand, they are inapplicable in the case at bar because the issue of voluntary manslaughter was not raised by the evidence, and the trial court erroneously but harmlessly included the issue of voluntary manslaughter in the charge.

■ Tex.Penal Code Ann. § 19.04 defines voluntary manslaughter, in pertinent part, as follows:

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

Testimony of the defendant alone is sufficient to raise the issue of voluntary manslaughter, and, once raised, the court is bound to submit the issue for jury determination without determining the weight or the truth or falsity of the testimony. *Medlock v. State,* 591 S.W.2d 485, 486 (Tex.Cr. App.1979); *Roberts v. State,* 590 S.W.2d 498, 500 (Tex.Cr.App.1979).

■ The homicide in question occurred in an apartment with only the deceased and the appellant present. Since a charge on voluntary manslaughter is mandatory only when evidence raises the issue, *Luck v. State,* 588 S.W.2d 371 (Tex.Cr.App.1979), *cert. denied,* 446 U.S. 944, 100 S.Ct. 2171, 64 L.Ed.2d 799, we examine in detail the testimony of the appellant to determine whether or not voluntary manslaughter was raised.

Appellant testified that he had arrived in Houston several days prior to the homicide, checked into a motel, and thereafter moved to a cheaper one. He was introduced to the deceased, Joseph Chamberlain, at a bar on Westheimer by Ron Young, whom he had met the day before, and who told appellant that Chamberlain might give him a job. Chamberlain invited appellant to his apartment nearby, and appellant accompanied him there. Appellant testified that Chamberlain seated him in the living room, gave him two homosexual and sado-masochistic magazines to read, and left the room. In a few moments, Chamberlain, dressed in a green jumpsuit and gas mask, rushed from the bedroom back into the living room and, armed with an ice pick which he stuck in appellant's back as he grabbed appellant's arm, pushed him into the bedroom and onto a bed. Chamberlain jumped on top of appellant, slipped a nylon cord around his hands, and tied him to the bed, spread-eagle and face down. Chamberlain then gagged and blindfolded him, ripped appellant's clothes off and beat him with a belt.

For approximately the next forty-eight hours, appellant was subjected to all manner of perverted and sadistic torture for Chamberlain's sexual gratification. Appellant was beaten and hot wax was dropped on him. A dog collar was placed around his neck. Foreign objects were inserted in his rectum. At one point Chamberlain made him crawl, shackled, to the bathroom and there wiped feces on his face. He was given no food or drink. Chamberlain threatened many times to kill him and speculated aloud about the ways he would dispose of appellant's body. Appellant testified that he then made up his mind that "if he was going to kill me, that if I had an opportunity to, that I would indeed kill him."

After approximately two days of these atrocities, appellant testified that he passed out, and regained consciousness to find himself alone in the apartment in the daylight of what was now apparently Monday. He managed to loosen himself from the ropes binding him to the bedposts. Once free, he

showered in Chamberlain's bathroom and dressed in some of Chamberlain's clothes since his own were torn. Filled with rage, he searched Chamberlain's apartment for a gun "before I determined that I would have to go buy one to protect myself and do to him what I figured, what I thought he darned well deserved, and that's that." He found a key to use to gain re-entry, noted the telephone number, left Chamberlain's apartment, and returned to his own motel room in his car. He did not report the incident to the police since, as he testified, he was a homosexual and did not think the police would believe him.

At his motel room, he changed into his own clothes and left to buy a gun. "I was going to—I wanted to kill Joseph Chamberlain" for what he had done. Between six and seven p.m., appellant went to Esther Imports and, using the identification of a James L. Richards that he had been carrying in his car, purchased a gun in Richard's name, "[b]ecause I didn't want to use my own." From the gunshop, he drove directly back to Chamberlain's apartment and parked in the parking lot "somewhat away from the apartment." He then went to a telephone and phoned Chamberlain's apartment, where no one answered, thus satisfying himself that no one was home. Using the key he had earlier taken, he entered Chamberlain's apartment and sat in the living room, gun in hand, awaiting Chamberlain's return. After a long time, he went into the bathroom, taking the gun with him. He then went back to the bedroom, "where he would expect to find me where he left me," and lay down on the bed. Fatigued and drowsy from lack of sleep and from taking valium, he put the gun on the night stand beside the bed and fell asleep.

Later that night, appellant was awakened by Chamberlain entering the room, turning on the light, and saying, "You little bitch, you got loose, didn't you? I figured out how I am going to do it now, and I am going to get you."

Appellant's defense testimony on direct examination by his attorney continued:

Q. What did he do? What did he say?

A. I was just waking up and I was very, very groggy, very groggy. He had startled me and the immediacy of the matter came upon me all at once.

Q. Well, tell the jury what he did and what he said.

A. He saw me on my side, that I was turned away from him, and I was waking up, and he went over to the side very quickly, over the side of the bed and he said, "Oh, my God." I assume he saw the gun. When he saw that and he dived for it and I just—I got to it first. If he had, I wouldn't be here today, but that's all right.

PROSECUTOR: Of course, I will object to that, your Honor.

Q. (Appellant's attorney) What did you do when you got the gun?

A. He turned back like there was a—

Q. What did he say when you got the gun?

A. I shot him.

Q. Do you recall how many times you shot him?

A. No, I don't. I just shot him.

Q. Did you state whether or not he said, "I am going to shoot you"?

A. He said, "I am going to kill you."

Q. Can you state whether or not it was at the same time he was going for the gun?

A. Yes, sir, he said that. He said it twice. He said it when he turned on the light and then he said it as we were, as he was coming around like this, and I was trying to wake up and figure what in the heck was happening now.

Q. All right, Paul, you have stated to the jury that when you went and bought that gun, you were going to kill Mr. Chamberlain. Is that correct?

A. I was going to go buy that gun and I was enraged at him.

Q. For what he had done to you?

A. Yes.

Q. Is that correct?

A. Yes.

**308**

Q. Now, why did you shoot him when you did? Can you state whether or not you were in fear of your life?

A. I was in serious fear of my life.

Q. Can you state whether or not this is why you shot him?

A. Yes, sir, I was. It was, it was down to that I wished I had never gone back.

Q. Can you state whether or not, though, you shot him out of fear for him because of that gun?

A. That's right. I did not have it in my hand. It was out of my hand on the nightstand.

■ The court fully charged the jury on the law of self-defense. The fact that the evidence raises the issue of and the court charges on the law of self-defense does not entitle a defendant to a charge on voluntary manslaughter unless there is evidence that the homicide occurred under the *immediate* influence of sudden passion arising from an adequate cause. *Daniels v. State,* 645 S.W.2d 459 (Tex.Cr.App.1983); *Luck v. State, supra.*

■ Appellant testified consistently that the torture and indignities inflicted upon him by the deceased *before* he first left the apartment caused him to decide to kill Chamberlain. His actions from the time he left the apartment were directed continuously toward the goal of killing Chamberlain. Appellant's use of a false name to purchase the gun, the stealth of the manner of his re-entry into the apartment, and his vigil pending the deceased's return—all confirm his intention to kill based on *former* provocation. Such a "passion" motivating appellant cannot reasonably be said to be *sudden,* or arising at the time of the shooting. *Hobson v. State,* 644 S.W.2d 473 (Tex.Cr.App.1983) (en banc)

■ Appellant argues that his period of reflection and determination ended when he fell asleep; that he was not in full control at the time he groggily awakened and shot the deceased; and that he experienced not only horror and hatred at seeing his torturer again, but panic in being unprepared. However, his statements that "I was in serious fear of my life" and "[I]t was down to that I wished I had never gone back" were both consistent with his plan to kill Chamberlain based on former provocation; each entitled him to the self-defense charge since one who kills in fear or terror to remove a threat to his own life is excused for the killing. Tex.Penal Code Ann. § 9.31. Voluntary manslaughter was therefore not raised by the evidence, and its submission by the trial court was gratuitous and harmless. Appellant's seventh ground of error is overruled.

In his first ground of error, appellant contends that the trial court erred in refusing, at the punishment phase of the trial, to include in the charge his requested instruction and a verdict form which would permit the jury to assess a penitentiary term with probation as authorized under Tex.Code Crim.Pro.Ann. art. 42.12, Sec. 3a (Vernon 1979).

■ The burden of proof as to a defendant's eligibility for probation is upon him. *Baker v. State,* 519 S.W.2d 437 (Tex.Cr.App.1975); *Herring v. State,* 440 S.W.2d 649 (Tex.Cr.App.1969). A jury may not recommend probation in its verdict unless both the sworn motion and the evidence show, and the jury finds in its verdict, that the defendant has never before been convicted of a felony in this or any other state. Art. 42.12 Sec. 3a, *supra.*

No evidence was produced before the jury, either at the guilt-innocence phase or at the punishment phase of trial, that the appellant had never been convicted of a felony. The appellant was not available at the punishment hearing for his lawyer to call as a witness to offer proof that he had never before been convicted of a felony: he had failed to return to court near the end of the guilt-innocence trial, his bail had been forfeited, and he was to remain at large as a fugitive from September of 1976 until October of 1980, when he was returned to custody and sentenced. During the guilt-innocence phase of the trial appellant executed his application for adult probation before the clerk of the court, out of the jury's presence.

The clerk of the court, called as a witness at the punishment phase of the trial, testified that he administered the oath taken by appellant when he signed the sworn motion for probation, and the motion was read in evidence. The reading of the sworn motion proved that appellant had filed a sworn motion for probation alleging that he had never been convicted of a felony; however, it did not constitute proof of the matter asserted.

The jury need not be charged on the issue of probation in the absence of evidence before the jury to support the motion for probation. *Walker v. State,* 440 S.W.2d 653, 659 (Tex.Cr.App.1969). The mere filing of the motion was not sufficient, *Palasota v. State,* 460 S.W.2d 137, 140–141 (Tex.Cr.App.1970), and hearsay has no probative value, *Alexander v. State,* 587 S.W.2d 729, 732 (Tex.Cr.App.1979); *Mendoza v. State,* 522 S.W.2d 898 (Tex.Cr.App. 1975). The court's refusal to submit this punishment verdict option to the jury was not error.

Appellant's first ground of error is overruled.

In his second ground of error, appellant claims the trial court abused its discretion in granting the State's motion in limine prohibiting him from impeaching one of the State's witnesses with evidence of that witness' prior criminal record. The record reflects that the trial court ruled that the appellant could not inquire about the witness' two prior convictions without first approaching the bench.

A ruling on a motion in limine does not preserve error. There must be a ruling on a proffer of evidence. *Basham v. State,* 608 S.W.2d 677, 679 (Tex.Cr.App.1980); *Harrington v. State,* 547 S.W.2d 616, 620 (Tex.Cr.App.1977). Since appellant did not request a ruling on the admissibility of this impeachment evidence during examination, he cannot now claim error.

Appellant's second ground of error is overruled.

Appellant's third, fourth, and fifth grounds of error urge that the trial court erred in sustaining the State's objections to offered testimony of defense witness Edward Balastine and to certain portions of the deposition testimony of Ronald Young.

Appellant claims he was prohibited from showing the deceased's sado-masochistic tendencies and ownership of certain "leather" articles by the court's exclusion, on grounds of immateriality, of Balastine's testimony about his visit to the deceased's apartment.

In order to show a person's bad reputation for peacefulness in the community, it is necessary to qualify the witness by showing that he is acquainted with the person's reputation in the community. *Beecham v. State,* 580 S.W.2d 588, 590 (Tex.Cr. App.1979). Such testimony must be based not on the witness' personal knowledge or opinion of the person or the violent acts which the person has committed, but on what the witness has heard from others. *Id.* Balastine's testimony was inadmissible as evidence of the deceased's general reputation. The appellant had not testified at the time of the exclusion, and evidence had not been offered to show either specific acts of violence by the deceased or appellant's claim of self-defense. Appellant's third ground of error is overruled.

Appellant's fourth and fifth grounds of error complain of the court's exclusion of deposition testimony by Ronald Young concerning the deceased's reputation as a sadist and Young's conversation with the deceased wherein the deceased threatened appellant. We note that many of the incidents he claims were kept from the jury actually were not. However, the exclusion of those incidents that were refused was justified because they were either hearsay or immaterial when offered, or called for conclusions by the witness. The fourth and fifth grounds of error are overruled.

Appellant's sixth ground of error alleges that the trial court erred in that the charge to the jury at the guilt-innocence phase of the trial authorized his conviction for an offense not alleged in the indictment.

The indictment charged appellant with murder by "unlawfully, intentionally and knowingly causing the death of Joseph Chamberlain by shooting him with a gun," in accordance with Tex.Penal Code Ann. sec. 19.02(a)(1) (Vernon 1974). The jury was correctly charged as to murder. However, in instructing the jury on the lesser offense of voluntary manslaughter, the court defined voluntary manslaughter and proceeded to apply the law to the facts as follows:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 28th day of January, 1975, in Harris County, Texas, the Defendant, Paul C. Green, did then and there intentionally or knowingly cause the death of another person, Joseph Chamberlain, by shooting him with a gun, *or that the Defendant did then and there intend to cause serious bodily injury to the said Joseph Chamberlain and with said intent to cause such injury did commit an act clearly dangerous to human life, to wit, shooting the said Joseph Chamberlain with a gun* and causing the death of said Joseph Chamberlain but you further find and believe from all the facts and circumstances in evidence in the case, the Defendant, in killing the deceased, if he did, acted under the immediate influence of sudden passion arising from an adequate cause, or if you have a reasonable doubt as to whether Defendant acted under the immediate influence of a sudden passion arising from an adequate cause, *then you will find the Defendant guilty of voluntary manslaughter.* (Emphasis added).

Appellant protests that this charge authorized his conviction on two theories of voluntary manslaughter, one based on intent to cause the death of the victim and one based on intent to cause serious bodily injury and commission of an act clearly dangerous to human life that resulted in the death of the victim. Such enlargement on the indictment, he contends, renders the charge fundamentally defective. *See Cumbie v. State,* 578 S.W.2d 732, 734 (Tex.Cr.App.1979).

 We concluded in our earlier discussion of appellant's seventh ground of error that voluntary manslaughter was harmlessly but erroneously submitted to the jury. Since error in submission of the "proper theory" of voluntary manslaughter was harmless, the jury's refusal to find guilt under the expanded version was also harmless. Had the jury found appellant guilty of voluntary manslaughter instead of murder, when the evidence did not justify its submission, the error would have been not merely harmless, but actually advantageous to him. *Billy Joe Smith v. State,* No. 956–82 (Tex.Cr.App., May 11, 1983) (not yet published). Had appellant been entitled to have voluntary manslaughter submitted, however, and had the jury convicted him of that lesser included offense, the charge as given would have been fundamentally defective. *Colbert v. State,* 615 S.W.2d 754 (Tex.Cr.App.1981). Appellant's sixth ground of error is overruled.

The judgment is affirmed.